**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 15-cv-00116-CMA

JERRY ALAN DUGWYLER,

      Plaintiff,

v.

CAROLYN W. COLVIN,
      Acting Commissioner of Social Security,

      Defendant.

---

**ORDER REVERSING AND REMANDING ALJ'S DECISION**
**DENYING SOCIAL SECURITY BENEFITS**

---

This matter is before the Court on review of the Commissioner's decision to deny Plaintiff Alan Dugwyler's ("Plaintiff's") application for disability benefits. Jurisdiction is proper under 42 U.S.C. § 405(g).

## I. BACKGROUND

### A. MEDICAL EVIDENCE

Plaintiff, born in 1960, was almost 49 years old on January 1, 2009, the date of his alleged disability onset. (AR at 103.)[1] He has a B.A. in Economics and completed one year of seminary graduate work. (AR at 310.) Plaintiff has, in the past, been employed as a maintenance supervisor, a corporate safety and compliance officer, a transportation manager, a telemarketer, and a truck driver. (AR at 297.) He alleged

---

[1] The Court refers and cites to the Administrative Record in this matter, located at Doc. # 12, as "AR."

that he was disabled due to coronary artery disease and obesity, as well as depression

and social anxiety.  (AR at 103.)

    With regard to his psychological ailments, Plaintiff alleged that he had struggled

with anxiety since junior high school or high school, received a diagnosis for anxiety

problems in the late 1990s, and had taken a variety of psychiatric medications since

then.  (AR at 309.)  Plaintiff began seeing treatment providers at Mental Health Partners

in Longmont, Colorado, in June of 2011.  (*Id.*)  At Mental Health Partners, he was

evaluated by Dr. Mark Kabat, D.O. whose notes indicate that Plaintiff reported that:

> [H]is sleep pattern is off.  He has both hypersomnolence and insomnia –
> being up in the middle of the night. . .  His energy is low.  He is aware he's
> both physically and mentally out of shape.  He reports feelings sad most of
> the day nearly every day.  He doesn't cry, but wants to at times.  He has
> anhedonia[2] – such as not being outdoors.  He is not socializing, isolating,
> and is neglecting his hygiene – going days without brushing his teeth and
> can go 1 week without bathing.  Jerry feels helpless (about job situation),
> hopeless (except for today) and worthless.

(*Id.*)  Plaintiff also saw Licensed Professional Counselor Ellen Rosenberg for about six

months (from June 2011 through December 2011).  On June 8, 2011, Plaintiff told Ms.

Rosenberg that his "depression and anxiety are so bad that he leaves the house only

2x/week (for kids' softball games) and mostly sits in a chair watching TV or thinking.

Becomes very anxious thinking about interacting with people."  (AR at 319.)  He also

told her that his anti-depressant medication was "helping some, but s[ymptoms] still

significant."  (*Id.*)  She diagnosed him with social phobia and major depression.  (AR at

316.)  In March of 2012, Ms. Rosenberg filled out a "Mental Impairment Questionnaire"

---

[2] "Anhedonia" is defined as "Markedly diminished interest or pleasure in almost all activities
nearly every day."  http://www.webmd.com/depression/guide/major-depression

in which she stated that Plaintiff's prognosis was "very good **with** vocational & psychological supports to help **keep** a job," and noted that he experienced recurrent severe panic attacks an average of once per month, memory impairment, sleep disturbance, paranoid thinking, emotional withdrawal or isolation, anhedonia, appetite disturbance with weight change, decreased energy, mood disturbance, difficulty thinking or concentrating, and psychomotor retardation.  (AR at 795-97) (emphasis in original). She rated him as having between "moderate" and "marked" restrictions on daily living; "marked" difficulties in maintaining social functioning; "moderate" deficiencies of concentration, persistence or pace; and also noted that he had experienced three repeated episodes of decompensation within 12 month period, each of at least two weeks duration (and indicated that he had experienced "three episodes of decompensation within 12 months, at least two weeks long").  (AR at 797.)  She noted that it would be "hard to judge" how often his impairment would cause him to be absent from work, but selected "about three days per month" (with a question mark).  (AR at 798.)  She also stated that his impairment lasted or could be expected to last at least twelve months.  (*Id.*)

In December of 2011, Martin Wong, Ph.D., performed a psychological consultative examination of Plaintiff at the request of the Colorado state agency.  (AR at 700.)  Dr. Wong noted that "There are a few pages of medical evidence provided with the referral; primary among these is an evaluation by Boulder Community Mental Health Center.  This describes Mr. Dugwyler as obese and having problems with Depression

and Anxiety." (*Id.*)  With respect to activities of daily living, Dr. Wong's report states as

follows:

> [H]e does not do much at all.   He tends to sleep quite a bit, sometimes
> during the day and sometimes at night.  He states that he tends to sit and
> watch television quite a bit, 'flipping around the channels.' . . . He spends
> some time with his children, going to their organized games.  He is able to
> go shopping.  Sometimes he goes to visit his parents in Littleton,
> Colorado.  He participates in the cooking, cleaning, washing and shopping
> although he admits to not doing as much as he thinks that he ought to do.
> He spends some time on the computer surfing the Internet, looking at the
> news, and so forth. . . . His primary exercise is to walk a little, which he
> states that he does once or twice a week.  He admits to no current
> hobbies.

(AR at 700-01.)  Dr. Wong described Plaintiff's mood as "generally dysthymic. Affect is

blunted," but stated that his thought processes were "logical, coherent, and sequential."

(AR at 702.)  He stated that Plaintiff was able to remember two of three words after a

three-minute delay, that his judgment and insight were intact, and that he was

"intelligent" and "understands.  He is able to perform mathematical operations without

too much difficulty.  Mr. Dugwyler certainly could follow one and two-step instructions."

(AR at 703.)  Dr. Wong did not diagnose Plaintiff with depression, but did assign him a

Global Assessment of Functioning (GAF) score of 60,[3] and diagnosed him with

"dysthymic disorder with anxiety."[4]  (*Id.*)

---

[3] "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (quoting The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed.2000).)  A GAF score of 51–60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id.*  A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Id.*

[4] "Dysthymia" is a less severe but chronic form of depression. *Knight v. Astrue*, 388 F. App'x 768, 771 (10th Cir. 2010) (unpublished) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical

In January of 2012, Gayle Frommelt, Ph.D., a nonexamining State agency psychologist, completed an assessment of Plaintiff's mental Residual Functional Capacity.  Her entire analysis reads as follows:

> [T]his 51 yo man alleges social andiety [sic], depression and heart disease.  He takes psych meds but is in no other psych t[reatment]. He manages adls [sic] w/in physical limits.  His mse [sic] was intact for concentration, memory and fund of knowledge.  He has few friends and dysthymic mood.  This man retains the ability to work of limited complexity that could be learned in 6 mths [sic] time.  He can manage social interactions that are not frequent or prolonged.  He would do best w minimal contact w gen. public.

(AR at 114-15.)

In March of 2012. Psychiatrist Leon Que, M.D., evaluated Plaintiff and noted that "overall, Mr. Dugwyler is at a chronically elevated risk of self-harm" and also that "from a disease perspective, the patient has evidence of genetic loading as noticed by a history of major depression in his father.  His younger brother also committed suicide when the younger brother was 13 years of age."  (AR at 981.)  Dr. Que diagnosed Plaintiff with major depressive disorder (recurrent and severe), and assessed him with a GAF score of 55.  (AR at 982.)

Dr. Heidi Arden, Ph.D., who has treated Plaintiff from November 2012 to present, also filled out a "Mental Impairment Questionnaire" in March of 2013, noting that his prognosis was "fair, though relapse of symptoms throughout the lifespan is a probability."  (AR at 989.)  Unlike Ms. Rosenberg's Questionnaire, Dr. Arden did not indicate that Plaintiff experienced recurrent severe panic attacks, paranoid thinking or

---

Manual of Mental Disorders 379 (4th ed., text revision 2000) (DSM–IV); *McGoffin v. Barnhart*, 288 F.3d 1248, 1250 n. 1 (10th Cir. 2002)).

inappropriate suspiciousness, or memory impairment; however, she did note that he experienced sleep disturbance, emotional withdrawal or isolation, anhedonia, appetite disturbance with weight change, decreased energy, mood disturbance, difficulty thinking or concentrating, and psychomotor retardation.  (*Id.*)  She diagnosed him with major depressive disorder and social anxiety disorder, and assigned him a current GAF of 60 and a highest GAF for the past year of 60.  (AR at 988.)  She rated him as having "moderate" restrictions of activities of daily living, "marked" difficulties in maintaining social functioning; "marked" deficiencies of concentration, persistence, or pace; and "one or two" repeated episodes of decompensation within a 12 month period, each of at least two weeks duration (and indicated that Plaintiff had a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.")  (AR at 990-91.)  In describing "any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," she noted, "[e]nergy and motivational issues, low confidence, extreme social anxiety that would result in problems seeking help, communicating with colleagues and supervisors."  (AR at 991.)

With regard to his physiological ailments, Plaintiff's chief issue is his coronary artery disease and resulting angina.[5]  Plaintiff first sought treatment for his coronary artery disease with Kaiser Permanente in November of 2009.  (AR at 487-596.)  In

---

[5] "Angina is a term used for chest pain caused by reduced blood flow to the heart muscle. Angina is a symptom of coronary artery disease.  Angina is typically described as squeezing, pressure, heaviness, tightness or pain in your chest."  http://www.mayoclinic.org/diseases-conditions/angina/basics/definition/con-20031194

October of 2010, he began treatment for his heart condition with Dr. Daniel White at Rocky Mountain Cardiology.  (AR at 685.)  Plaintiff was subsequently referred for right and left heart catheterizations as well as other heart-related tests at Longmont United Hospital.  (AR at 830.)  Plaintiff continued to receive treatment from Dr. Reynolds throughout 2011.  (AR at 809-20.)

In January of 2012, Dr. Paul H. Barrett, Jr., M.D., a nonexamining consultant, provided a physical residual functional capacity assessment for Plaintiff, opining that Plaintiff was capable of "frequently" lifting and/or carrying 10 pounds, that he could stand and/or walk for four hours, that he could "occasionally" climb ramps, stairs, ladders, ropes, or scaffolds and had no other limitations (e.g., balancing,s tooping, kneeling, etc.)  (AR at 112-113.)  Under the form's prompt to "explain postural limitations and how and why the evidence supports your conclusions.  Cite specific facts upon which your conclusions are based," Dr. Barrett wrote two words: "exertional dyspenea."[6] (AR at 113.)  Under "RFC – Additional Explanation," he wrote, "obesity, CAD [Coronary Artery Disease], sleep apnea, DM II, high pulmonary artery pressure all taken into account."  (*Id.*)

In August of 2012, Plaintiff presented at St. Anthony Hospital complaining of dizziness, chest pain, and back pain. (AR at 837.)  After a stress test, he was admitted to the intensive care unit, and underwent another cardiac cathaterization  and a stent was placed in his right coronary artery.  (AR at 884.)  Ultimately, he was diagnosed with

---

[6] "Dyspenea" is defined as "shortness of breath."
http://www.mayoclinic.org/symptoms/shortness-of-breath/basics/definition/sym-20050890

coronary artery disease with unstable angina, vertigo, hypertension, and diabetes.  (AR at 837.)

Dr. Peter Kriekard, a cardiologist who began treating Plaintiff in June of 2012, filled out a "Residual Functional Capacity Questionnaire" in March of 2013.  Due to Plaintiff's coronary artery disease, morbid obesity, and Class II New York Heart Association (NYHA) heart failure, Dr. Kriekard opined that Plaintiff could stand/walk less than 2 hours, could sit at least 6 hours if he were permitted to shift "at will," and also that Plaintiff could "frequently" lift less than 10 pounds, "occasionally" lift 10 or 20 pounds, but "never" lift 50 pounds.  (AR at 986.)  He also opined that Plaintiff could not climb ladders or stairs.  (*Id*.)  Dr. Kriekard noted that Plaintiff experienced anginal pain a few times per month with exertion, that Plaintiff did not experience angina at low levels of physical activity, and that Plaintiff's chest pain was relieved with rest.  (AR at 983-84, 987.)  Dr. Kriekard also indicated that stress can contribute to Plaintiff's angina, and that his heart condition had also contributed to his depression.  (AR at 984.)

## B.  **HEARING TESTIMONY**

**Plaintiff's Testimony**

At a hearing before the Administrative Law Judge (ALJ) on April 3, 2013, Plaintiff testified that he lived with his parents but did not contribute to their mortgage, and that "on a good day I'll pick up around the house, and that's about the extent of it . . . newspapers, magazines; a plate or cup here and there, that kind of thing."  (AR at 48, 49.)  He spoke about how he struggled with motivation to do simple things like chores, and that he became easily frustrated and angry, even with people he knows well, like

his family.  (AR at 79, 81.)  He testified that he also slept eight to twelve hours during

the day, approximately two times a week, and had done so for the past few years.  (AR

at 52.)  He also described how he spent most of his days sitting, either watching TV for

a few hours or surfing the internet "in spurts" (10-15 minutes at a time), and that he

could motivate himself to dress in sweats and a shirt on a daily basis and to bathe about

every week to a week and a half.  (AR at 81-83.)  He also testified that he was able to

attend his daughter's softball games, "usually once a week . ..  that's the kind of thing

where I can go sit in the stands, nod at the other parents, and not really interact; just

watch the games."  (AR at 84.)

Plaintiff also testified that, prior to the summer of 2012, he could walk for about

12 minutes at a time, but since June of 2012, he could walk a maximum of three to four

minutes at a time before experiencing chest pain.  (AR at 67-68).  He also described

how he could stand for 15 minutes from January 2009 until December 2012, and ten

minutes since December 2012.  (AR at 69-70.)  He stated that he had no physical

difficulty sitting, but he alleged that he could only sit for two to three hours at a time due

to an inability to concentrate for longer periods.  (AR at 71.)

When the ALJ asked Plaintiff, "what is it about the social anxiety that you feel

keeps you working at any kind of job," he explained:

> [I]t's very difficult for me to leave the house.  I can do things like, say, go to
> the grocery store, walk down the aisles with, you know, no interaction with
> people, limited interaction with the checkout person, and then go home.
> That kind of thing I can do.  But where I have to spend time interacting and
> talking with people I very rarely am able to do that.  I do that when I have
> to; going to the doctor.

When the ALJ followed up and asked about Plaintiff's 2-month stint working for RTD as

a bus driver, he responded:

> You need money to live and take care of your family.  So I tried to push
> through the different limits that I had.  The times that I were late were
> because I was fighting the urge to stay in the house, and then finally got
> up the gumption to go.  The times that I missed were because I couldn't
> win that battle [with social anxiety], and I was not able to leave the house.
> So I tried to work.  To some degree I was successful, but I was not
> successful enough to keep the job.

(AR at 65.)

**Vocational Expert's Testimony**

A vocational expert (VE) also testified at the hearing, and was asked to consider

a hypothetical individual with Plaintiff's age, education, and work experience, with the

following limitations: he could perform light work (such that he could occasionally climb

ramps and stairs but never ladders, scaffolds or ropes and could frequently balance,

crouch, kneel, crawl and stoop); could not be exposed to assembly-line work due to

limitations due to stress, persistence and pace; and could not do work involving

sustained, intense concentration; and could interact with the public and co-workers

frequently.  (AR at 95-96.)  The VE testified that this hypothetical individual could

perform Plaintiff's past relevant work both as a transportation manager and safety

officer.  (AR at 96.)

**C.  THE ALJ'S DECISION**

On May 31, 2013, the ALJ issued an unfavorable decision denying benefits.  (AR

at 19-38.)  In applying the five-step sequential evaluation process outlined in 20 C.F.R.

§§ 404.1520 and 416.920 to determine whether Plaintiff was disabled, the ALJ determined that:

1.     Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 1, 2009 [Step 1];

2.     Plaintiff had the following severe impairments: "affective disorder, anxiety disorder, obesity, and coronary artery disease with corpulmonae" [Step 2];

3.     Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 [Step 3];

4.     Plaintiff had the Residual Functional Capacity (RFC) to "lift 20 lbs. occasionally and 10 lbs. frequently.  During an 8-hour workday, the claimant is able to stand and/or walk4 hours and sit for 6 hours.  The claimant is able to climb ramps and stairs occasionally.  The claimant should avid climbing ladders, ropes, and scaffolds.  The claimant should avoid all exposure to unprotected heights.  The claimant is able to perform the following postural activities frequently: balance, bend, stoop, crouch, kneel, and crawl.  The claimant should not perform any assembly line work because of limitations regarding persistence, pace, and stress.  The claimant cannot engage in work requiring intense, sustained concentration.  The claimant is able to interact with the public frequently and with coworkers frequently."  [Step 4]; and

5.      Plaintiff was capable of performing past relevant work as a transportation

manager and safety officer. [Step 5].

## II.  <u>STANDARD OF REVIEW</u>

A person is disabled within the meaning of the Social Security Act only if his

physical and/or mental impairments preclude him from performing both his previous

work and any other "substantial gainful work which exists in the national economy."  42

U.S.C. § 423(d)(2).  "When a claimant has one or more severe impairments the Social

Security [Act] requires the [Commissioner] to consider the combined effects of the

impairments in making a disability determination."  *Campbell v. Bowen*, 822 F.2d 1518,

1521 (10th Cir.1987) (citing 42 U.S.C. § 423(d)(2)(C)).  To be disabling, the claimant's

condition must be so functionally limiting as to preclude any substantial gainful activity

for at least twelve consecutive months.  *See Kelley v. Chater*, 62 F.3d 335, 338 (10th

Cir. 1995).

This Court's review of the ALJ's disability decision is limited to determining

whether the ALJ's decision is supported by substantial evidence and whether the ALJ

applied the correct legal standards.  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir.

2009).  Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  It requires more than a scintilla but less

than a preponderance.  *Wall*, 561 F.3d at 1084.  In reviewing the record and the

arguments of counsel, the Court does not reexamine the issues *de novo*, *Sisco v.

United States Department of Health and Human Services*, 10 F.3d 739, 741 (10th Cir.

1993), nor does it re-weigh the evidence or substitute its judgment for that of the

Commissioner, *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).  Thus, even

when some evidence may have supported contrary findings, the Court "may not

displace the agency's choice between two fairly conflicting views," even if the Court may

have "made a different choice had the matter been before it *de novo*."  *Oldham v.*

*Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).  The ALJ's decision, however, is

evaluated based solely on the reasons stated in that decision – not *post hoc*

rationalizations made by the Commissioner.  *Robinson v. Barnhart*, 366 F.3d 1078,

1084-85 (10th Cir. 2004).

### III.  ANALYSIS

Plaintiff contends that the ALJ erred because he failed to give appropriate

consideration to Plaintiff's treating physicians and also inappropriately favored the

medical opinions of the three state consultative examiners, two of whom had never

examined Plaintiff.  The Court agrees.

As a general rule, "the opinions of physicians who have treated a patient over a

period of time or who are consulted for purposes of treatment are given greater weight

than are reports of physicians employed and paid by the government for the purpose of

defending against a disability claim."  *Sorenson v. Bowen*, 888 F.2d 706, 711 (10th Cir.

1989); *see also Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20

C.F.R. § 416.927(d)(2)) ("The treating physician's opinion is given particular weight

because of his or her 'unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations.'")

Additionally, the reports of reviewing physicians are accorded less weight than those of examining physicians, "and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

The evaluation of the opinion of a treating source is a two-step process. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  First, the ALJ must decide whether the treating source's opinion is entitled to "controlling" weight, i.e., whether it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record."  20 C.F.R. § 404.1527(c)(2).  An ALJ may decide not to assign controlling weight when a treating source's opinion is brief, conclusory, or unsupported by other substantial medical evidence in the record.  *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

In the instant case, at the first step, the ALJ explained that he did not assign "controlling" weight to the opinions of Plaintiff's treating sources[7] for the **sole reason** that the state agency review physicians and consultative examiners disagreed with the Plaintiff's treating physicians: "the State Agency review physicians . . . concluded that claimant's limitations would not preclude the performance of substantial gainful activity. **Thus, the treating source opinions are not consistent with this substantial**

---

[7] Here, Dr. Arden, Ph.D. (a licensed psychologist) and Dr. Kriekard, M.D. (a cardiologist) constituted treating sources.  *See* 20 C.F.R. § 404.1513(a) ("Acceptable medical sources include licensed medical or osteopathic doctors, licensed or certified psychologists . . . .); 20 C.F.R. § 1527(d) (only "acceptable medical sources" can be considered "treating sources.")  Ms. Rosenberg, as a Licensed Professional Counselor, is classified as an "other medical source" whose information may help the ALJ understand how the claimant's impairment affects his ability to work.  See 20 C.F.R. §§ 404.1502, 404.1513(d). The ALJ noted that he "considered" Ms. Rosenberg's opinion despite the fact that she was not considered a "treating" source.  (AR at 34.)

**evidence**."  (AR at 31) (emphasis added).  Although this might constitute a permissible

reason for rejecting the treating sources had the State Agency review physicians, in

fact, provided **substantial** evidence contradicting the substantial evidence provided by

Plaintiff's treating sources, a close examination of the State Agency review physicians'

actual records and findings reveals that, far from being "substantial," their opinions were

"brief, conclusory, and unsupported by medical findings."  *See Frey*, 816 F.2d at 513.

> For example, Gayle Frommelt, Ph.D., the state's mental health consultative

examiner, provided a single-page "checklist"-type form of Plaintiff's mental RFC (for

example, she notes without further elaboration that Plaintiff is "moderately limited" in his

"ability to interact appropriately with the general public"), and the longest "explanation"

she provides about Plaintiff's RFC reads as follows:

> [T]his 51 yo man alleges social andiety [sic], depression and heart
> disease.  He takes psych meds but is in no other psych t[reatment]. He
> manages adls [sic] w/in physical limits.  His mse [sic] was intact for
> concentration, memory and fund [sic] of knowledge.  He has few friends
> and dysthymic mood.  This man retains the ability to work of limited
> complexity that could be learned in 6 mths [sic] time.  He can manage
> social interactions that are not frequent or prolonged.  He would do best w
> [sic] minimal contact w gen. [sic] public.

(AR at 115.)  Similarly, Dr. Barrett's analysis is confined to a single-page "checklist"-type

form, in which he provides no analysis or evidence whatsoever (for example, citations to

medical records, or anything else for that matter), for his conclusions that Plaintiff was

capable of "frequently" lifting and/or carrying 10 pounds, that he could stand and/or walk

for four hours, that he could "occasionally" climb ramps, stairs, ladders, ropes, or

scaffolds and had no other limitations (*e.g.*, balancing, stooping, kneeling, etc.)  (AR at

112-113.)  Under the form's prompt to "explain postural limitations and **how and why**

**the evidence supports your conclusions**" and to **"[c]ite specific facts upon which your conclusions are based,**" Dr. Barrett provided a two-word explanation: "exertional dyspenea."  (AR at 113) (emphasis added).  Under "RFC – Additional Explanation," he wrote the following: "obesity, CAD [Coronary Artery Disease], sleep apnea, DM II, high pulmonary artery pressure all taken into account."  (*Id.*)

Martin Wong, Ph.D., who performed a psychological consultative examination in December of 2011, is a slightly closer call in terms of substantive evidence, because he actually examined Plaintiff (albeit on a single occasion) and provided **some** explanation for his findings.  (AR at 700.)  Critically, however, Dr. Wong performed his examination in 2011, a full year before Dr. Arden began treating Plaintiff and two years before she rendered her mental RFC evaluation.  Indeed, Dr. Wong's notes make it clear that he did not even review the entire medical evidence which was available in 2011; he specifically states that "There are **a few pages** of medical evidence provided with the referral; primary among these is an evaluation by Boulder Community Mental Health Center.  This describes Mr. Dugwyler as obese and having problems with Depression and Anxiety."  (AR at 700) (emphasis added).  *See Daniell v. Astrue*, 384 F. App'x 798, 803 (10th Cir. 2010) (unpublished) (noting that an ALJ erred in explaining why he preferred a consultative source's opinion over the treating source because the former's "opinion was based solely on a review of the medical records from [plaintiff's] consultative examination in January 2005, and did not include a review of any of the medical records or assessments provided by [the treating physicians].")  However, the ALJ does not mention this fact, nor explain why Dr. Wong's analysis – which was

specifically contradicted by a treating physician approximately two years later – is more reliable, much less why it constitutes substantial evidence.  "When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the non-treating physicians' reports "to see if [they] 'outweigh[ ]' the treating physician's report, not the other way around."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (internal citation omitted).

As such, the ALJ erred at the first step of the treating source evaluation, because he "did not identify any . . . **substantial** medical evidence that outweighed the treating physician opinions."  *See Daniell*, 384 F. App'x at 802 (emphasis added); *see also Watkins*, 350 F.3d at 1300 ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [treating source's] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.")

Even if a treating source's opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and must also give good reasons, **tied to the factors specified in the regulations for this particular purpose**, for the weight assigned.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  If this is not done, a remand is required.  *Id*.  As the Tenth Circuit has explained:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not

> entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the [relevant] factors . . . . **In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight**.

*Id.* (quoting SSR 96–2p, 1996 WL 374188, at *4) (emphasis added).  These factors include: the physician's length of treatment of the claimant; the physician's frequency of examination; the nature and extent of the treatment relationship; the support of the physician's opinion afforded by the medical evidence of record; the consistency of the opinion with the record as a whole; and the specialization of the treating physician.   20 C.F.R. § 404.1527(c)(2).  If the ALJ rejects the opinion completely, he must then give "specific, legitimate reasons" for doing so.  *Watkins*, 350 F.3d at 1301 (internal quotation and quotation marks omitted).  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright **only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion**."  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis added) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotations omitted)).  Although the Court may not second-guess an ALJ's credibility judgments, such judgments by themselves "do not carry the day and override the medical opinion of a treating physician that is supported by the record."  *Id.* Additionally, "[a]n ALJ's assertion that a family doctor naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician."  *McGoffin*, 288 F.3d at 1253.

Applying the standards above, the Court concludes that the ALJ also erred in in

deciding the comparative or relative weight to which he should give the treating sources.

In an earlier portion of his opinion, the ALJ discussed how he found that Plaintiff was

"not fully credible" because Plaintiff's activities of daily living "appear to be inconsistent

with [his] assertion of being unable to perform any kind of work."  (AR at 26.)[8]  The ALJ

explained that, given this credibility determination, he decided to assign "no significant

weight" to the opinions of Ms. Rosenberg, Plaintiff's treating counselor, and Dr. Arden,

Plaintiff's treating psychologist, because:

> **It appears from the medical records generated by both of these
> medical sources, that the statements made and symptoms reported
> by the claimant were simply accepted at face value.**  Indeed, there is
> nothing in the medical treatment records to suggest otherwise.  **For
> example, there is nothing in the medical treatment records to
> suggest that these treating sources conducted any type of validity
> testing.**[9]  This information is the health care equivalent of self-reporting—
> i.e., what a person says about his or her symptoms, condition, etc.  It is
> self-evident that accurate and reliable self-reporting by a patient is
> essential to a correct diagnosis, to an appropriate mode of treatment, and
> to a well-reasoned prognosis.  **Here, the claimant has provided
> information to the treating source not only in the context of health
> care, but also in the context of a medico-legal setting.  Here,
> claimant's self-reports have been made during the time the claimant**

---

[8] The ALJ provided specific examples of this inconsistency – pointing to, for instance, the fact that Plaintiff at least implicitly asserted he could work because he applied for unemployment benefits; the fact that "during a 6-month period, the claimant failed to show or cancelled five health care appointments"; and the fact that Plaintiff testified that "the maximum amount of time that he was able to stand at one time was 15 minutes during the period from 2009 to 2012. . . . [However,] [p]rior to the hearing, in February 2011, Bryan Reynolds, MD, observed the claimant to walk for 30 minutes without any angina."  (AR at 27-28.)  To be clear, Plaintiff did not challenge the ALJ's credibility findings, but **did** challenge how those findings were **used** by the ALJ in evaluating the treating sources' opinions.  (Doc. # 17 at 4.)

[9] Notably, the consultative and examining state agency mental health sources did not perform any "validity testing" of Plaintiff, either, and also depended on Plaintiff's problematic "self reporting" – something the ALJ fails to mention in describing why he assigned their opinions more weight.

**has been pursuing this disability claim.**  In this context, this treating source has given opinions not only about the claimant's diagnosis and prognosis, but also about the claimant's functional limitations and inability to work . . .the credit I give to such medical opinions, especially regarding functional impairment and ability to work, depends in large part on the weight I give to the patient's self-reports.  And that, in turn, is largely dependent on the weight I give to the allegations of the claimant made during this disability claim, and my assessment of the claimant's credibility.  **In this case, I have found (as I explain elsewhere in this decision) that the claimant's allegations are not fully credible.**  As I have previously explained, full credibility of a patient's self-reporting is an essential underpinning [sic] the opinions and conclusions of treating sources.  **Thus, in this case, I am unable to give any significant weight to the treating source opinions regarding functional impairment or inability to work, because an essential element of the treating source assessments has been undermined.**

. . .

I conclude that such opinions are not "well-supported" by any objective clinical data.  Indeed, such opinions are not supported at all.  **I further conclude that the willingness by these medical sources to accommodate the claimant by offering an unsupported opinion such as this suggests a similar willingness to accommodate the claimant the in the other opinions this medical sources has [sic] provided.**[10]

---

[10] The ALJ also rejected Dr. Arden's opinion on account of it being "inconsistent," because "[f]irst, Dr. Arden stated that the claimant had a GAF score of 60, which . . . is reflective of the higher range of moderate symptoms or moderate difficulty in social, school, or occupational functioning.  Then, after being contacted by the claimant's representative, she explained that his GAF score is lower."  (AR at 36.)  In fact, Dr. Arden's letter makes clear that her opinion was not "inconsistent"; rather, it reflected the way that Plaintiff's functioning varied along with his depression:

> social functioning **currently varies** from moderate (with family and people he knows well, or who make an effort to reach out to him) to marked (with anyone else), due to his social anxiety.  **Notably, Mr. Dugwyler's level of social functioning deteriorates when he is more depressed** – last year, when he was experiencing a more severe level of depression, his psychological and social functioning were both markedly impaired – probably in the 45-50 range.  **Mr. Dugwyler's ability to maintain concentration, persistence, and pace is likely related to the severity of any depressive symptoms he is experiencing, as well as his social anxiety** (e.g., in a work setting, I believe he would struggle to stay on task for fear of others' perceptions of him) and his physical problems.  In general, I believe that Mr. Duwyler possesses the ability to maintain focus and pace as he strives to complete tasks; however, in a work

(AR at 35-36) (emphasis added).  In effect, then, the ALJ provides three inter-related

reasons for assigning effectively no weight to the treating sources' opinions: 1) the ALJ

did not find Plaintiff to be credible, but the treating sources "accepted" Plaintiff's own

"self-reporting" of his symptoms "at face value" in making their determinations; 2) there

was no "validity testing" conducted or "objective clinical data" provided by the treating

sources; and 3) the treating sources made their determinations in what the ALJ termed

a "medico-legal" setting in which he baldly asserted -- simply by virtue of the fact that

Plaintiff was applying for disability benefits – that they were willing to "accommodate the

claimant" in (presumably, falsely) supporting his disability claim.  In so doing, he failed

to mention, much less apply, the factors mandated by 20 C.F.R. § 404.1527(c)(2) –

such as the treating physician's length of treatment of the claimant; the frequency of

examination; the nature and extent of the treatment relationship; or the specialization of

the treating physician.  *See* 20 C.F.R. § 404.1527(c)(2).  Although his analysis of

Plaintiff's credibility and the lack of validity testing might appear, at first blush, to be an

attempt to analyze whether the treating sources' opinions were supported by the

medical evidence of record or consistent with the record as a whole, a claimant's

credibility cannot be considered in assessing **medical evidence**; rather, a claimant's

credibility is pertinent only as to statements about his or her symptoms, and then only to

assess the intensity, persistence, and functional limitations of such symptoms.  20 CFR

---

setting (or something similar), where the demand would be different and would involve a
social component, his concentration, persistence and pace would most certainly suffer.

(AR at 1000) (emphasis added).

§ 404.1529 and 416.929.  Additionally, the ALJ's reference to the lack of "objective clinical data" or validity testing misses the mark.

In determining disability claims, the existence and the extent of an impairment is determined by considering evidence of "Signs" and "Symptoms." "Signs" are objective medically recognized facts that can be described, evaluated, and documented using acceptable clinical, diagnostic, or laboratory techniques, whereas "symptoms" are the claimant's own descriptions of his or her physical or mental impairment.  20 CFR § 404.1528(b); 20 CFR § 404.1508.  Because there is no "dipstick" laboratory test for disabling depression, in the psychiatric/ psychological context, an opinion about the extent of a mental disability may rest either on observed signs and symptoms **or** on psychological tests.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (citing 20 C.F.R. Subpart P, App. 1 § 12.00(B)); *Schwarz v. Barnhart*, 70 F. App'x 512, 518 (10th Cir. 2003) (unpublished) (emphasis added) ("There is no 'dipstrick' test for disabling depression. . . . The accepted clinical technique for diagnosing such an impairment is to assess the existence and severity of symptoms and signs identified by the American Psychiatric Association in the DSM–IV.  **This assessment is usually based on a patient's subjective reports and the psychologist's own observations**. Although psychological tests may be used in evaluating a patient, they do not produce laboratory-type results, instead requiring interpretation of the patient's responses."); *Thomas v. Barnhart*, 147 F. App'x 755, 759-60 (10th Cir. 2005) (unpublished) ("The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements. . . .  The ALJ's approach of rejecting [the treating source's]

opinion because he based it, in part, on [the claimant's] responses to his psychological

tests involving memory and concentration impermissibly put the ALJ in the position of

judging a medical professional on the assessment of medical data.")

Thus, contrary to the ALJ's assertion that Dr. Arden's conclusions about

claimant's limitations were "not supported at all"[11] (AR at 36), the record shows that

they were based on her **evaluation** and **interpretation, informed by her medical**

**training,** of Plaintiff's signs and symptoms, and they do, in fact, constitute specific

medical findings.  The Tenth Circuit has made it clear that an ALJ "may reject a treating

physician's opinion outright **only on the basis of contradictory medical evidence** and

**not due to his or her own credibility judgments**, speculation or lay opinion."

*McGoffin*, 288 F.3d at 1252. Accordingly, the ALJ erred here, as his credibility

judgments – rather than contradictory substantive medical evidence – "carr[ied] the day

and overr[ode] the medical opinion of a treating physician."  *Id.*  In *Valdez v. Barnhart*,

63 Fed. App'x. 838 (10th Cir. 2003) (unpublished), the Tenth Circuit considered facts

very similar to those presented here.  In *Valdez*, the ALJ rejected opinions of treating

physicians with regard to the claimant's mental impairments based on an assessment of

the credibility of the claimant's own description of his symptoms.  That court reversed

---

[11] It also bears mention that if the ALJ did not believe that the treating sources' opinions were based on medically acceptable clinical and laboratory diagnostic techniques, he had a duty to re-contact the treating sources for clarification and further information.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."); *McGoffin*, 288 F.3d at 1252 (holding ALJ had obligation to recontact treating physician if validity of his report open to question).

the Commissioner's decision to deny benefits, finding that that the ALJ erred in applying

the correct legal standard, and observed:

> The ALJ rejected [the treating source's] opinion, stating that it was based
> on plaintiff's complaints, which the ALJ found were not credible. **This
> approach impermissibly put the ALJ in the position of judging a
> medical professional on how he should assess medical data** —
> plaintiff's complaints. **An ALJ may not substitute his lay opinion for a
> medical opinion.**

62 Fed. App'x. at 842 (emphasis added); *see also McGoffin v. Barnhart*, 288 F.3d 1248,

1252 (10th Cir. 2002); *Thomas v. Barnhart*, 147 Fed. App'x. 755, 759-60 (10th Cir.

2005) (unpublished).  The problematic nature of the ALJ's conclusion is only further

compounded by the ALJ's (utterly unfounded) implication that the treating sources are

improperly "accommodating" Plaintiff merely because of the "medico-legal setting" in

which his treatment occurred; "[a]n ALJ's assertion that a family doctor naturally

advocates his patient's cause is not a good reason to reject his opinion as a treating

physician." *McGoffin*, 288 F.3d at 1253.

The ALJ's error is highlighted when his analysis of Plaintiff's treating sources is

contrasted with his analysis of the opinions of nonexamining consultative sources.  In a

boilerplate explanation, he noted that he assigned "more weight" to the opinions of

nonexamining consultative sources Paul H. Barrett Jr., M.D., and Gayle Frommelt,

Ph.D., because:

> I give more weight to the opinion of a specialist about medical issues
> related to his or her area of specialty than to the opinion of a source who
> is not a specialist. **These medical sources are specialists in the field
> of the Claimant's particular impairment.  I give more weight to the
> opinions of medical sources who are experts in Social Security
> disability evaluation**.  Stated another way, the amount of weight given
> depends on the amount of understanding of SSA disability programs and

their evidentiary requirements that an acceptable medical source has. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists. They have an enhanced understanding of SSA disability programs and their evidentiary requirements, and they are also experts in Social Security disability evaluation. In this case, the State Agency Physicians and Psychologists reviewed the claimant's condition. **They have expertise in the disability regulations and the listing impairments promulgated by the Social Security Administration. They have had experience applying the regulatory requirements to the alleged medical conditions at issue in this case. These medical sources have reviewed more of the complete case record.** The complete case record provides more detailed and comprehensive information than what was available to the treating source. Moreover, the more consistent an opinion is with the record as a whole, the more weight I will give to that opinion. **In this case, these medical source opinions are more consistent with the longitudinal record.** Accordingly, I have given more weight to these medical source opinions.

(AR at 32) (emphasis added). The ALJ also uses this "boilerplate" – almost verbatim – in explaining weight he assigned to Dr. Wong's opinion, the psychological consultative examiner who met with Plaintiff on a single occasion:

I give more weight to the opinions of this medical source, relative to the opinions of all other medical sources, for the following reasons. I give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. **This medical source is a specialist in the field of the Claimant's particular impairment. I give more weight to the opinions of medical sources who are experts in Social Security disability evaluation.** Stated another way, the amount of weight given depends on the amount of understanding of SSA disability programs and their evidentiary requirements that an acceptable medical source has. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists. They have an enhanced understanding of SSA disability programs and their evidentiary requirements, and they are also experts in Social Security disability evaluation. In this case, a Consultative Examiner (CE) examined the claimant. **This medical source has expertise in the disability regulations and the listing impairments promulgated by the Social**

**Security Administration.**  The CE has had experience applying the regulatory requirements to the conditions at issue in this case.  The more consistent an opinion is with the record as a whole, the more weight I will give to that opinion.  **In this case, this medical source opinion is more consistent with the longitudinal record**.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight I will give that opinion.  The better the explanation a medical source provides for an opinion, the more weight I will give that opinion.  **This medical source presented more relevant supporting evidence, and provided more satisfactory supporting explanations, for the opinions given.**  Accordingly, I give more weight to the opinions of this medical source.

(AR at 33.)

Both of these explanations are conclusory; although the ALJ asserts that the medical sources "presented more relevant supporting evidence, and provided more satisfactory supporting explanations, for the opinions given," he does not describe **what** evidence he is referring to,[12] nor does he explain **why** the consultative and examining providers' explanations were any more "satisfactory" than those provided by the treating sources, nor **why** their opinions were "more consistent with the longitudinal record." *See Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004) (remanding ALJ's decision in part because "in stating that the doctor's opinion was 'inconsistent with the overall case record,'" the ALJ failed to "specifically highlight those portions of the record with which [the treating physician's] opinion was allegedly inconsistent"); *Langley v. Barnhart*, 373 F.3d 1116, 1122-23 (10th Cir. 2004) (remanding decision in which the

---

[12] The ALJ does summarize all of the medical evidence in an earlier narrative of the medical records; however, his lack of express analysis when discussing the weight he provided to medical sources means that the Court would be placed in the untenable position of searching for justifications in his summary of the medical evidence and then applying this evidence to his own conclusions.  "[Although] [i]t may be possible to assemble support for [the ALJ's] conclusion from parts of the record cited elsewhere in the ALJ's decision, but that is best left for the ALJ himself to do in the proceedings on remand."  *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011).

ALJ stated that a treating physician's opinion was "not supported by objective medical evidence in th[e] case, including his own records," because "the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record," and thus his reasoning was not "sufficiently specific to enable this court to meaningfully review his findings").  The ALJ also states that the consultative and examining sources were "specialists" in the field of "the Claimant's particular impairment" – but this factor is more or less a wash, because the treating sources were also such specialists.  The ALJ's statement about how consultative and examining sources were superior because they have "expertise in the disability regulations and the listing impairments promulgated by the Social Security Administration" is curious, if not downright problematic, because it effectively turns the treating source rule on its head; many (if not most) treating physicians, by virtue of being independent doctors, often work outside of the social security disability system and are unlikely to possess such quasi-legal "expertise."  Indeed, the Tenth Circuit has specifically cautioned that "the reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of **physicians employed and paid by the government** for the purpose of defending against a disability claim," *Frey*, 816 F.2d at 513 (emphasis added), and also that "the opinion of an agency physician who has never seen the claimant is entitled to the **least weight of all**," *Robinson*, 366 F.3d at 1084 (emphasis added).

In sum, the ALJ erred as a matter of law in improperly considering the credibility of the claimant's statements in assessing the opinions of treating sources and he also erred in deciding the comparative or relative weight to which he should give the treating sources.  Because this error may well have infected his RFC determinations, which were contingent (at least in part) upon his acceptance of the examining and consultative sources' opinions,[13] the Court does not reach the remaining issues because they may be affected by the ALJ's treatment on remand.  *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.   CONCLUSION

For the foregoing reasons, it is ORDERED that the ALJ's denial of disability benefits is REVERSED and this case is REMANDED for further proceedings consistent with this order.

DATED:  October 30, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[13] Although the Court declines to provide a full analysis of the ALJ's RFC analysis, it is struck by the fact that the ALJ assumed, in crafting the RFC and eliciting testimony from the VE, that Plaintiff would be able to "interact with the public frequently and coworkers frequently," given that no medical source opined that Plaintiff had these abilities.  Indeed, Gayle Frommelt, Ph.D., the state's mental health consultative examiner – whose opinion the ALJ specifically credited – found that Plaintiff could "manage social interactions that are not frequent or prolonged.  He would do best w [sic] minimal contact w gen. [sic] public."  (AR at 115.)   The ALJ apparently came to this conclusion on his own, in explaining that Plaintiff's "work activities after the alleged onset date, particularly his bus driver jobs, demonstrate that the claimant can interact with the public on a frequent basis and he did not report any problems with co-workers."  (AR at 33.)